IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIAM B. DUREN                                                                                          PLAINTIFF

v.                                     Civil No. 4:06-cv-04053

MIKE WADE; and RICK
STONE, both of the Miller
County Correctional Facility                                                                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff, William B. Duren, (hereinafter "Duren" or "Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Duren is currently incarcerated in a unit of the Arkansas Department of Correction. The incidents at issue in this case occurred on July 28, 2005, while he was incarcerated at the Miller County Detention Facility.

Defendants filed a summary judgment motion (Doc. 24). To assist Duren in responding to the summary judgment motion, a questionnaire was propounded (Doc. 28) by the Court. Duren filed a timely response to the questionnaire (Doc. 31). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

### 1. Duren's Claims

In this case Duren contends his constitutional rights were violated when excessive force was used against him on July 28, 2005. He also maintains his constitutional rights were violated when he was placed in lock-down for five days without due process.

The defendants have filed a Motion for Summary Judgment asserting that the degree of force used was reasonable under the circumstances. Therefore, defendants maintain the facts do not reach

-1-

the level declared to be unconstitutional by the United States Supreme Court. Furthermore, defendants contend they are entitled to qualified immunity.

On the issue of Duren's five days of confinement following the July 28th incident, defendants merely make the assertion that Duren was placed on administrative segregation. They do not otherwise address this issue.

## 2. Background

Duren was booked into the Miller County Detention Facility (MCDF) on July 21, 2005, on felony burglary charges. *Plaintiff's Response* (Doc. 31) (*hereinafter Resp.*) at ¶ 1. The pending criminal charges were the only reason he was incarcerated. *Id.* at ¶ 2.

On July 28, 2005, Officer Alvin Howard was at the "D Max" cell block delivering commissary goods to detainees. *Resp.* at ¶ 3(A). Howard's nickname is Stone.[1] *Id.* According to Howard, the following occurred when he was delivering commissary goods:

> Mr. Duren asked why he did not receive any and I informed him that he had no money in his account. At this time, the Plaintiff's door to his cell was open and there was nothing restraining Mr. Duren. After I told Mr. Duren there was no money in his account, he became verbally abusive and aggressive towards me. I continued to try to calm Mr. Duren down, but was unsuccessful. His aggression towards me heightened and he pushed his finger into my nose. At no time during the incident did I choke Mr. Duren. After I assisted him to the floor, he continued to fight with me. At this time, Kevin Hampton entered the area and requested the Plaintiff to stop fighting. Mr. Duren would not cooperate and Mr. Hampton used mace to subdue the Plaintiff.

*Defendants' Exhibit* (*hereinafter Defts' Ex.*) C at ¶¶ 3-12.

Officer Kevin Hampton[2] provides the following account of the incident:

---

[1] By separate order, the docket sheet will be corrected to reflect the correct name of the defendant listed as Rick Stone is Alvin Howard.

[2] The court will add Kevin Hampton as a defendant by separate order.

> I was not present when the altercation started, but when I arrived Deputy Howard was struggling on the ground with a detainee named William Duren. Officer Howard was trying to subdue the detainee and the detainee was fighting with the officer. I entered the cell and verbally commanded Mr. Duren to calm down and stop fighting three times. When Mr. Duren refused to stop fighting, I sprayed him with mase. Mr. Duren was very uncooperative and would not follow instructions from me or Officer Howard. I never physically touched Mr. Duren during the altercation. After I sprayed Mr. Duren with mase, he was taken to the shower for detoxification purposes. I never witnessed at any time Deputy Howard choke the Plaintiff.

*Defts' Ex.* D.

Officer Renee Wright wrote the following narrative report about the incident:

> July 28 at approximately 13:30 hours Officer Alvin Howard was at D Max explaining to an inmate that the reason he didn't receive commissary is because he didn't have any money, which is why he wasn't in the system. The inmate stated that was "bullshit" and shook his finger in Officer Howard face. Officer Howard stated to the inmate don't put your finger in my face, I'll let you get away with that once but I won't twice. It was at this time the inmate told him again with his finger at the Officer's nose that was "bullshit". Since Officer Howard had already told the inmate not to put his finger his in face in a threatening manner, he assisted the inmate to the floor. Officer Hampton also is the Max area assisted Officer Howard. The inmate would not stay on the floor as instructed and Officer Hampton spayed him one time with mace. The inmate then complied and went to the floor. Officer Wade responded to D max and a few minutes later Sgt. Nicholson and myself responded. This inmate was taken to Holding 4 for Administrative Segregation. He will spend 5 days there for safety reasons.

*Defts' Ex.* B.

According to Duren, he pointed his finger at Howard and said: "You've got be f----- up." *Resp.* at ¶ 5(A). Duren denies he was aggressive and states that as soon as he pointed toward Howard the second time he immediately attacked Duren. *Id.* at ¶ 6(B). Duren also states he was never closer to Howard than about five feet. *Id.* at ¶ 7(A).

Duren maintains Howard "grabbed me by my throat and slammed me to the ground falling on my chest and continued to choke me." *Resp.* at ¶ 8. Duren states he did not resist. *Id.* According

to Duren, Officer Hampton arrived after initial incident. *Resp.* at ¶ 9(A). Duren denied that Hampton issued any commands. *Id.* at ¶ 9(B). Instead, Duren states Howard said: "I'm going to let you up, stay calm." *Id.* When Duren got up, he maintains he was immediately sprayed with mace by Hampton one time. *Id.* at ¶ 9(B) & ¶ 11(A). Duren agrees that Hampton never physically touched him. *Id.* at ¶ 11(B).

According to Duren, after he was sprayed with mace, both Hampton and Howard left the pod and he went to his assigned cell because he was unable to see because of the mace being sprayed in his face. *Resp.* at ¶ 12. Officer Wade, Sgt. Nicholson, and Sgt. Renee Wright then came to the pod. *Id.* at ¶ 13. Duren asserts he was never allowed to shower. *Resp.* at ¶ 15. Instead, he states he was merely given a wet wash cloth by Wright to decontaminate. *Id.*

Duren concedes Mike Wade was not present in the pod during the altercation. *Resp.* at ¶ 20. Duren also admits Wade did not personally witness the altercation. *Id.* at ¶ 23. However, Duren contends Wade and Howard came to his cell and physically escorted him out of his cell and then slammed him into the wall in the hallway so restraints could be put on him. *Resp.* at ¶ 24. Duren points out that Howard admitted in discovery responses that Wright gave Wade an order in the hallway saying: "Mike stop it that's enough." *Plaintiff's Exhibit (hereinafter Plff's Ex.)* 1 at 13; *Plff's Ex.* 2 at 1.

Wade, however, denies that the supervisor gave him this order. *Plff's Ex.* 3 at 16; *Plff's Ex.* 4 at 17. In fact, Wade asserts by affidavit and in response to each discovery request that he was not involved in the July 28th incident. *Defts' Ex.* E; *Plff's Ex.* 3; *Plff's Ex.* 4. Wade contends he

believes Duren has simply mistaken him for another officer in regard to the incident he is complaining of. *Defts' Ex.* E at ¶ 2.

As a result of the use of force on July 28th, Duren contends he suffered several scrapes, cuts, and abrasions. *Resp.* at ¶ 25. He also indicates he experienced severe burning and irritation from the mace. *Id.* He asserts he sought medical attention but his request was denied. *Id.* He indicates he also suffered from depression and increased anxiety and fear towards officers and other authority figures he should be able to trust.

Duren asserts Warden Jeff Black advised him he would be placed on five days lock-down after the incident. *Resp.* at ¶ 16. Duren indicates the lock-down was for punitive reasons. *Id.* at ¶ 17.

### 3. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient

evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 4. Discussion

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). Mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Keeping these general principles in mind, I turn to an examination of the specific constitutional rights at issue in this case. I examine each of Duren's claims in turn.

#### A. *Excessive Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Duren was a pretrial detainee. Excessive force claims of pretrial detainees are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *See e.g., Johnson-El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989). *See also Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard.").

The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Duren and the defendants give contradictory versions of what happened on July 28th. While Duren admits using profanity towards Howard and pointing his finger at Howard twice, Duren denies resisting in anyway or engaging in any of the other conduct attributed to him by Howard. *Resp*. at ¶ 5(B). In fact, Duren indicates he was approximately five feet from Howard. *Id*. at ¶ 7(A).

Duren contends Howard rushed him, grabbed him by the throat, slammed him to the floor, fell on his chest, and continued to choke him. *Resp*. at ¶ 8. After Hampton arrived, Duren was allowed to get up but he contends he was immediately maced when he did so. *Id*. at ¶ 9(B). Finally, Duren contends when Wade and Howard came to his cell to take him to the holding cell he was slammed in the hallway so restraints could be put on. *Id*. at ¶ 24.

In contrast, Howard contends Duren pushed his finger into Howard's nose. *Defts' Ex.* C at ¶ 7. In response, Howard indicates he "assisted" Duren to the floor. *Id.* at ¶ 8. Howard denies choking Duren. *Id.* Both Howard and Hampton assert that Duren continued to fight and would not cooperate, as a result the mace was used to subdue him. *Defts' Ex.* C at ¶¶ 10-12; *Defts' Ex.* D at ¶¶ 3-5.

Wade denies any involvement in the events of July 28th. In Wade's affidavit he asserts he did not personally witness the incident in question and was not involved in the incident in which physical force was used to control Duren. *See Defts' Ex.* E at ¶ 4. In defendants' brief they argue that plaintiff has mistaken Wade with another officer. *See e.g., Defts' Brief* (Doc. 25) at page 5. Defendants do not address the fact that it appears a "Michael Wade" signed the July 28th use of force report as a witness. *Defts' Ex.* B at page 3. This report was completed following the use of mace on Duren. *Id.*

I note also that in responding to requests for admission, Wade stated that when he "entered the cell, the situation was defused, and the Plaintiff was in handcuffs and being escorted out of the pod." *Plff's Ex.* 3 at 1. However, Howard appears to have provided discovery responses which contradict those of Wade. First, Howard indicates Wade was involved in escorting Duren out of the cell. Howard was asked to admit or deny that he and Wade entered Duren's cell and physically escorted Duren to the hallway where a supervisor was waiting. Howard answered "admit" to this statement. *Plff's Ex.* 1 at 11. Second, Howard provides a discovery response which suggests Wade may have been involved in some type of use of force against Duren. Howard was asked to: "Admit or Deny that the supervisor Mrs. Renae gave Defendant Wade a order to stop by saying 'Mike stop

it that's enough.'" *Plff's Ex*. 1 at 13.    Howard answered:  "Admit.  The Plaintiff was still trying to fight."  *Id*. at 13.

I believe there are genuine issues of material fact as to whether excessive force was used against Duren.  Because the parties have different versions of what occurred on July 28th, I cannot, at the summary judgment stage, merely choose to believe the defendants' version of the events and disbelieve Duren's version of the events.

### *B. Qualified Immunity*

I turn to defendants' argument that they are entitled to qualified immunity.  "Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).  The inquiry is normally one of pure law.  *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process."  *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001).  First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).  Second, the court must determine if the right was clearly established.  *See Washington*, 272 F.3d at 256.  "[T]here is no

question that [the] right to be free from excessive force" is clearly established. *Wilson*, 209 F.3d at 716. *See also McGruder v. Heagwood*, 197 F.3d 918 (8th Cir. 1999).

As discussed in more detail above, Duren maintains he was five feet from Howard when he used profanity and pointed his finger at Howard. Duren asserts Howard responded by grabbing him by the throat, slamming him to the floor, and continuing to choke him. After Duren was allowed to get off the floor, Duren contends he was immediately sprayed with mace by Hampton. Once he was being escorted from his cell, Duren contends he was slammed into the wall in the hallway by Howard and Wade. During this entire time, Duren denies he was physically resisting in anyway.

Defendants maintain that Duren was not only verbally abusive but also aggressive towards Howard. Howard contends Duren pushed his finger into Howard's nose. Howard indicates he merely "assisted" Duren to the floor. Howard denies grabbing Duren by the throat or choking him. When Duren refused to quit fighting, defendants indicate Hampton entered the area and mace was used to subdue Duren. Wade denies that he used any force against Duren or had any involvement in the incident.

Viewed in the light most favorable to Duren, the evidence does not show an objective need for the force that was used because Duren was not jeopardizing any person's safety and was not threatening the security of the facility. *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002). "The law recognizes that order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, nor does it justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Id.* (citations omitted). *See Graham v. Conner*, 490 U.S. 386, 395 n. 10, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)(pre-trial detainee's claim properly analyzed under the due process clause of the Fourteenth Amendment).

As noted above, defendants offer a contradictory version of the events of July 28th and maintain Duren was being aggressive and was physically resisting all efforts to subdue and restrain him. At this stage, we cannot resolve the factual disputes in the defendants' favor. Their "arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [their] favor." *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001). On the record before the court, I find defendants not entitled to qualified immunity.

### C. Lock-Down/Administrative Segregation

Under the Due Process Clause of the United States Constitution, a pretrial detainee may not be punished prior to an adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "We [therefore] begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not be punished."). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537. In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002)(citations omitted). If "there is no indication of such an express intent," the court next

considers "whether punitive intent can be inferred from the nature of the restriction." *Valdez*, 302 F.3d at 1045.

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted).

In *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002), the Seventh Circuit stated:

> A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less. But no process is required if he is placed in segregation not as punishment but for managerial reasons. Suppose for example that the only vacant cell left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision. Or suppose, . . . that a prisoner was placed under particularly restrictive conditions of confinement at the jail because he was considered a suicide risk. Again, no hearing would be required. Ditto if he was placed in segregation to protect himself from other prisoners, or to protect jail staff from his violent propensities. As long as the purpose was indeed preventive rather than a punitive one, he would not be entitled to notice and a hearing. . . . In none of these cases would a hearing be practicable, or even useful, because managerial decisions do not have the character of rulings applying legal standards to facts, the kind of rulings for which adjudicative hearings are designed.

*Id.,* 286 F.3d at 438. *See Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment. . . . Regardless of whether the detentions are classified as 'administrative,' if a pre-trial detainee must remain in a lock-up area if he does not work, the detention amounts to punishment.").

In this case, Duren was moved to holding cell 4 following the July 28th incident. According to Duren, he was told by Warden Jeff Black that he "would serve 5 days lockdown." *Resp.* at ¶ 16. Duren maintains it was not for safety reasons but for punitive reasons. *Id.* According to detention center records, Duren was to spend "5 days there for safety reasons." *Defts' Ex.* B at page 1. The records refer to the confinement as "administrative segregation." *Id.*

I believe defendants are entitled to summary judgment on this claim. First, there is no indication Wade or Howard were involved in the decision to place Duren on administrative segregation or lock-down. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *See Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)(internal quotation marks and citation omitted). There is simply no basis on which the defendants can be held liable.

Second, regardless of merits of the excessive force claim asserted in this case, I believe the record establishes Duren was moved to administrative segregation for the safety and security of the facility. Duren concedes that he was involved in a verbal exchange with Howard in which Duren used profanity. Duren also concedes he pointed his finger at Howard twice. It was these actions which Howard viewed as aggressive. The verbal and physical altercation then came to the attention of supervisory officials and the decision was made to put Duren in administrative segregation.

Maintaining safety and internal order within a detention center are permissible nonpunitive objectives. *Bell v. Wolfish*, 441 U.S. 520, 538-40, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "A purely administrative reason for placing a pretrial detainee into segregation may be "to protect jail staff from [the detainee's] violent propensities." *Higgs*, 286 F.3d at 438. Defendants submitted as an exhibit a narrative report by Sgt. Renee Wright which indicates Duren was taken to "Holding 4

for Administrative Segregation and would "spend 5 days there for safety reasons." *Defts' Ex.* B at page 1. I conclude there are no genuine issues of material fact as to whether Duren was placed in the holding cell for punitive reasons rather than for the safety and security of the detention center.

### 5. Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 24) be granted in part and denied in part. Specifically, I recommend that the motion be denied on the excessive force claim. I further recommend that the motion be granted with respect to the claim that Duren was denied due process when he was placed in administrative segregation.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **21st day of August 2007.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE