IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIAM B. DUREN                                                                         PLAINTIFF

v.                                        Civil No. 4:06-cv-04053

MIKE WADE; ALVIN
HOWARD; and KEVIN
HAMPTON, All of the Miller
County Correctional Facility                                                       DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, William B. Duren, (hereinafter "Duren" or "Plaintiff") filed this civil rights

action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3) (2005), the Honorable Harry F. Barnes, United States

District Judge, referred this case to the undersigned for the purpose of making a report and

recommendation.

Duren is currently incarcerated in the Arkansas Department of Correction (ADC).  The events

at issue in this lawsuit occurred while he was incarcerated at the Miller County Correctional Facility

(MCCF).  Duren contends his constitutional rights were violated when excessive force was used

against him.

An evidentiary hearing was conducted on March 3, 2008.  At the conclusion of the hearing,

I took the matter under advisement pending preparation of this report and recommendation.

### 1. Background & Evidence Presented

Duren was booked into the MCCF on July 21, 2005, on pending criminal charges.  The events

at issue in this case occurred on July 28, 2005, in a cell block referred to as "Max pod D" or "D

Max."

-1-

At the evidentiary hearing, I heard the testimony of the following witnesses:  (1) William Duren; (2) Alvin Howard; (3) Kevin Hampton; (4) Mike Wade; and (5) Renee Wright.  For purposes of discussion, I will summarize in the first person the testimony given at the evidentiary hearing.

*William B. Duren*

I'm twenty-three years old.  I'm incarcerated in the East Arkansas Regional Unit of the Arkansas Department of Correction.

My biological father, Michael Crews, died on October 4, 2002.  My step-father, Kenneth Duren, was never arrested or held in the MCCF.

On July 28, 2005, Howard was delivering commissary to D Max.  I asked what happened to my commissary.  He said he would check on it.  He came back and said I had no money.  He made a statement that I owed someone.  He said someone was trying to get me or make sexual advances toward me.  I pointed my finger towards him and said bull----.  He said "I'll let you get away with pointing your finger at me once but not twice."  He said "white boy don't do it again."

I said you have me f----- up.  I pointed my finger at him again.  He grabbed me by the throat.  I fell back.  He was on top of me holding me down by the throat.  When I started to get up Hampton came in and maced me.  Howard was maced too and left the barracks.

Howard and Wade came back in and slammed me to the floor.  Hampton was there.  All three saw what happened, Hampton, Howard, and Wade.  Wright was at the barracks.  Wright and Nichols took me to booking.  Wright gave me a wet rag.  She helped clean me up with a wet wash cloth.  I didn't get a shower for eight hours until after the shift change came in.

She didn't ask me if I needed medical attention.  She took pictures.  She took me to Jeff Black's office.  I asked Black for medical attention.  He said I would be okay. He told me I would be put on lock down for five days.

I did make a mistake pointing at Howard the second time.  I got some scrapes and cuts on my neck and was burning from the pepper spray.  *See Plaintiff's Exhibits* K & L (two pictures of Duren's face and neck).  I didn't suffer any injuries from being slammed to the floor.  The pictures show the injuries I suffered. I healed in a couple of days.

I was in Miller County on possession of firearms and residential burglary charges.  I was released from Miller County in October.  This occurred on July 28th.  I had only been in Miller County seven days.  I had been transferred from Sevier County.  I had not been involved in any altercations before this occurred.  I was involved in altercations after this incident.  Two other incidents–one with an officer and one with an inmate.  *See Defendants' Exhibits* D & E.

### *Alvin Howard*

I work for the Miller County Sheriff's Department.  I'm currently a transport officer.  I have been employed by Miller County for five years.  In 2005 I had been there for two years.  I was a correctional officer at the time.  As a correctional officer, I made sure inmates' needs were met and the security needs of the jail were met.

I had no involvement with Duren before July 28, 2005.  I had no knowledge of Duren before that date.

About 1:30 p.m., I was passing out commissary.  I knew who had commissary and who didn't.  Duren approached the door saying he didn't receive his commissary.  He was cursing at the vent.  I said when I got through passing I would go to Ms. Beck's office and check on it.

I went to Ms. Beck's office and checked on it. He didn't have any money in his account. I went back and called him to the door. I told him the reason he didn't get his commissary was he didn't have any money. He said that "was bull----. You got me f----- up." He pointed his finger at me. I told him don't you do that. I'll let you do it once but not twice.

He did it again. When Duren pointed his finger the second time, I felt threatened. He pushed his finger to my nose. He was verbally and physically aggressive. I felt if I didn't stop it I would be more in danger. He could strike me and other inmates would feel they could do it. There were no barriers between us.

Hampton was not present. I went to assist Duren to the floor. I took his hand or arm. I put my leg behind his to assist him to the floor. I tried to take him to the ground. As we were struggling on the floor, Hampton entered the barracks. It probably took Hampton two to two and a half minutes to arrive.

Hampton then gave Duren verbal commands to stop fighting, stay down, and quit resisting. Duren was not complying. By then I had been struggling with him for three to three and a half minutes. Hampton sprayed him and I got sprayed too. The spray got in my eyes. When I got sprayed, Wade grabbed a hold of Duren and I left the barracks. I turned him loose. I had nothing more to do with him. Only reasonable force was used against Duren. *See Defendants' Exhibit* C (County policy on use of force and restraints).

In response, to discovery requests I did state that I entered Duren's cell with Wade and physically escorted him to the hallway where the supervisor was waiting. *Plaintiff's Exhibit* B at ¶ 11. This was incorrect. I was getting this incident mixed up with a second incident that happened a short time later that day. As I recall, Wade and Hampton escorted Duren out.

I didn't grab Duren by the throat.  Anytime an inmate touches an officer it is an assault.  I didn't witness Wade use force against Duren.  I didn't witness Duren being decontaminated.  The information about Duren and the shower was obtained second hand, I didn't have personal knowledge when I made those statements in response to discovery requests.  *See Plaintiff's Exhibit* B at ¶ 16 (Plaintiff was offered a shower and refused it) & *Plaintiff's Exhibit* C at ¶ 12 (I was not aware of any injuries suffered by the Plaintiff and the Plaintiff was immediately decontaminated after being sprayed with Oleoresin Capsicum spray).

About fifteen or twenty minutes after the incident with Duren, an inmate broke the glass in D pod.  Wade was told to stop that's enough.  I didn't hear Wright make any similar statement with respect to Duren.

I wrote an incident report the same day.  *Defendants' Exhibit* B.  It reflects what happened. I had no additional problems with Duren after this day.  I didn't specifically use the word assault. Duren touched my nose.  *See Defendants' Exhibit* B ("pushed his finger to my nose").  I was trying to prevent injury to myself.

### *Kevin Hampton*

I'm a correctional officer at the Miller County Jail.  I've worked for Miller County for nine years. I'm a sergeant now.  I started as a correctional officer.  I was a correctional officer at the time of the incident with Duren.

I was outside the door when I saw Duren touch Howard's nose.  I had to get control to open the door.  It took control a minute or so to let me in.

I never physically touched Duren.  I saw him through the door but I didn't arrive inside until Duren was on the floor.  Duren was struggling.  I told him stay down, stay down, stay down.  He

didn't. I sprayed him. I wanted to get the situation calmed down in order to get Duren under control before all the other inmates got involved.

Wade came in. I walked Duren up to the door of "Max 1." Then I turned around. I didn't have to put Duren in restraints. He was complying. Wade took Duren the rest of the way to intake. I don't know if Sgt. Renee put Duren in restraints.

I filled out a jail incident report the day it happened. *See Defendants' Exhibit* A. I told Duren three times to comply. If I had jumped on him it would have been two officers jumping on him. I sprayed him to keep the other inmates out of the situation. I also wanted to get in and get out quickly. I made the decision quickly. I feared other inmates might get involved because Duren's father was in the barracks.

When I said in the incident report that he was taken to decontamination, I assumed Wade was taking him. I only walked Duren half-way and then returned to my post. When I wrote in the incident report "he did comply" it should say "he did not comply." *See Defendants' Exhibit* A at page 2. Within thirty seconds of my spraying him, he was complying.

When I said in my affidavit, *Plaintiff's Exhibit* G at ¶ 7, that after I sprayed Duren he was taken to the shower for detoxification purposes, I could only take him half-way, Wade was to take him to the shower. This is the same reason I said in response to an interrogatory that "I did escort [Duren] to a shower for detoxification purposes along with everyone involved." *Plaintiff's Exhibit* H at ¶ 5. Wade and I were taking Duren to intake for detoxification. I stopped half-way to return to my post.

*Mike Wade*

I've worked for the Miller County Sheriff's Department for nine years. Currently I'm a deputy sheriff. I was a transport officer when the incident at issue in this case occurred.

On July 28, 2005, I was coming off of my lunch break when I was notified by radio by central, the main control of the jail, that there was a disturbance in Max D which is a barracks. I went to the cell block and witnessed what was occurring between Duren, Howard, and Hampton. Hampton had his mace out and was using it on Duren when I came up. Howard had gotten sprayed and was screaming. Duren had stopped struggling and said he would comply. I took over for Howard so he could leave the barracks.

Hampton and I started escorting Duren to the booking area. Hampton stopped at the Max cell block door. Hampton said he was the only one in the Max cell block so he needed to stay there. I took Duren the rest of the way to intake. Sgt. Wright met us. It was probably twenty-five yards from where Hampton stayed at the Max cell block door to the booking area. I told her there had been and altercation and then I went back to the Max cell block to help Hampton.

Duren was put in restraints. I saw Sgt. Wright take him to decontamination. I remember Sgt. Wright asking Duren if he needed medical attention and he said the little scratches didn't hurt him.

I signed the use of force report because I put my hands on Duren. *Plaintiff's Exhibit* I. The form indicates Duren was decontaminated and that medical forms were completed. *Id.* I didn't fill out the report. I just signed it. The officers who used force on Duren were Howard and Hampton. I just kneeled down and grabbed his arm. I used no other force.

There was no second incident with Duren.  There was an incident with another inmate within about ten or fifteen minutes of the incident with Duren.  I was not involved in any incident in a hallway with Duren.

### *Renee Wright*

I've been employed by Miller County for five years.  I don't remember Duren at all.  I've read this report, *Plaintiff's Exhibit* J, several times, although I must have written it, I just don't recall it. It is  possible I wrote it in response to Howard telling me about the incident.  I do recall Howard telling me about an inmate pushing a finger in his nose.  I fill out reports before my shift is over.

I filled out this use of force report.  *Plaintiff's Exhibit* I.  The writing is mine except for the signatures of the witnesses and the signatures of the officers using force.  I recall them talking about scratches.  I would have taken the pictures.  It was said that Duren's Father was in the barracks.

We have a shower in the booking area.  If they say they don't want to shower, I would give an inmate a wash rag.  I never refuse to allow an inmate to wash off pepper spray.  The policy is to allow an inmate to decontaminate.

The use of force report has a place for you to check medical forms completed.  In Duren's case, it is checked yes.  *See Plaintiff's Exhibit* I.  There are no medical forms per se unless the inmate is taken to the hospital.  This merely means that medical attention has been offered.  I don't recall if Duren asked to go to the hospital.

After the use of force report is filled out, I give the file to the warden and let him know it was completed.  I don't recall witnessing anything with my own eyes.

## 2.  Discussion

It is clear the state has no right to punish pretrial detainees.  *See Johnson-El v. Schoemehl*,

878 F.2d 1043, 1048 (8th Cir. 1989)(*citing Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861,

1871-72, 60 L. Ed. 2d 447 (1979)).  Excessive force claims brought by pretrial detainees are analyzed

under the Due Process Clause of the Fifth and Fourteenth Amendments.  *See Johnson-El*, 878 F.2d

at 1048-49.     The courts generally analyze excessive force claims of pretrial detainees in the same

way as those of arrestees.  *See Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The

evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth

and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective

reasonableness standard.").  The use of force must be necessary to some legitimate institutional

interest such as safety, security, or efficiency, and the force used must not be in excess of that

reasonably believed necessary to achieve those goals.  *See Schoemehl*, 878 F.2d at 1048.  The

relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and

circumstances confronting them.  *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Duren contends force was used against him twice within a short period of time.

The first application of force was when Howard struggled with Duren, took him to the floor, and then

Hampton sprayed him with OC spray.  The second application of force was when Duren maintains

Howard and Wade slammed him to the floor in the hallway.  During his closing argument, Duren

argued it was this ongoing use of force and not necessarily the initial incident that he believes

violated his rights.

I find Duren failed to prove by a preponderance of the evidence that Howard used excessive

force against him in taking him to the floor in the cell block.  It is undisputed that Howard and Duren

were involved in a verbal exchange regarding Duren's commissary order.  It is also undisputed that

after Duren pointed his finger at Howard the first time Howard warned Duren not to do so again.

Despite this warning, Duren did so a second time.  Duren admits he used poor judgment in doing so.

Both Howard and Hampton testified that Duren put his finger to Howard's nose on the second

occasion.  Howard was the only officer in an open barracks of inmates.  The situation with Duren

was escalating and it was objectively reasonable for Howard to use some amount of force to gain

control of Duren.  *See e.g., Thompson v. Zimmerman*, 350 F.3d 734 (8th Cir. 2003)(considering

whether plaintiff was resisting or endangering himself or others).  During the struggle, Duren suffered

only minor injuries, a few scratches to his neck that healed within a few days.  *See Plaintiff's Exhibits*

K & L.  He needed no medical treatment.  *See e.g. Greiner v. City of Champlin*, 27 F.3d 1346, 1355

(8th Cir. 1994)(proper to consider the lack or minor degree of injury).

While the two were struggling on the floor and Duren was attempting to get up, Hampton

entered the cell block.  Howard, Hampton, and Wade all testified that Hampton gave Duren several

verbal commands to quit struggling that were not complied with before Hampton made the decision

to use the Oleoresin Capsicum (OC) pepper spray.  Duren testified he was trying to get up when he

was sprayed.

Under the circumstances, I conclude that the "limited application of [pepper spray] to control

[Duren] constitute[d] a 'tempered response . . . when compared to other forms of force."  *Jones v.*

*Shields*, 207 F.3d 491, 496 (8th Cir. 2000)(discussing cases from a number of jurisdictions holding

the use of chemical agents did not constitute cruel and unusual punishment if reasonably necessary

to maintain security and order or subdue a recalcitrant prisoner).  A single burst of pepper spray was

used.  Although Duren was not allowed to shower, he was provided with a wet wash cloth and allowed to decontaminate the areas of his body sprayed by the chemical agent.

Finally, with respect to the second incident that occurred in the hallway when Duren alleges Howard and Wade slammed him to the floor and put restraints on him, I find Duren has failed to prove by a preponderance of the evidence that this incident occurred or if it occurred that excessive force was used.  The only testimony introduced regarding this incident was Duren's testimony.  He asserts Howard and Wade slammed him to the floor and put him in restraints. There is no mention of the use of force in any of the incident reports or in the use of force report.

Even if Duren was put on the floor in the hallway and restraints put on him, his lack of injury belies his claim that excessive force was used against him.  The only pictures taken by Sgt. Wright are of the scratches on Duren's neck caused during the first struggle with Howard on the floor in the cell block.  Duren testified he suffered no injuries when he was "slammed" to the floor in the hallway.  The absence of injuries supports the conclusion that the officers did not use excessive force against Duren in the hallway.  *See e.g., Wertish v. Krueger,* 433 F.3d 1062, 1067 (8th Cir. 2006)(relatively minor scrapes and bruises and temporary aggravation of shoulder problem were *de minimis* injuries and supported conclusion that officer did not use excessive force).

### 3. Conclusion

For the reasons stated, I recommend judgment be entered in defendants' favor and this case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections**

may result in waiver of the right to appeal questions of fact.  The parties are reminded that

objections must be both timely and specific to trigger de novo review by the district court.

DATED this 27th **day of March 2008.**


/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE